And Mr. Asbury, you may proceed to the podium, and I see that you have reserved some time for rebuttal as well. Thank you, Your Honor. May it please the Court, Anson Asbury for Appellant Mill Road. I am joined by Lauren White and Brian Gardner. The tax court should be reversed for two reasons. Because the property donated by Mill Road was not inventory in the hands of the contributing entities, and because the tax court did not apply the correct legal standard to determine the value of that property. First, inventory. The court below limited the value of the donated property to Mill Road's cost basis under Sections 170E and 724B because it found that the property was inventory in the hands of the contributing partners, Mill Road Partners 125 and Benwood Investments. The question is whether those entities held the donated property for sale in the ordinary course of business. Even the government concedes that there is no clear evidence in the record that there were actual sales by MRP. That's note 21 of their brief. The tax court erred by finding sales that simply didn't exist. Can I ask you a question about the inventory issue? What is your response to the Commissioner's argument that you have forfeited the burden of proof by not raising it before the tax court? Well, Your Honor, the tax court, it was a novel issue at the time. This was the first time 724B had ever been applied. I realize this court has seen the case Glade Creek, which got to us first but was actually developed on the inventory issue after we had. We responded in the briefing, Your Honor, when it was raised by the government. But we did not put specific evidence on at trial because we still believe there is no inventory issue. And you believe the burden belongs to the government, is that correct? Well, I think at tax court, Your Honor, we always bear the burden of proving our deduction. But you're not saying this is a new matter that the government would bear the burden on. You're saying it's your burden. I believe it was brought up by the government on brief, Your Honor. But we have not argued that we are shifting the burden on this question. So I'm sorry for the confusion there. No, I just wanted to make sure that you weren't suggesting that this was a new matter. We have not argued that it's a new matter, Your Honor. I'm sorry. Thank you. I'm falling. We focus on MRP because it was one of the two contributing partners. And it holds the real property that must be inventory in the hands of MR36 to satisfy the tax court's conclusion. Suburban Realty, this circuit's precedent, requires sales of the real property in the ordinary course of business for inventory treatment under Tax Code Section 1221. You don't think the partners here were in the ordinary course of business of property speculating? They were investors in property, unquestionably, Your Honor. That wasn't the question I asked. Let me put it this way more clearly. Was there evidence in the record that the partners here were in the business of dealing in real estate? Benwood Investments, Mr. Helms testified that he indeed did buy and sell property. Didn't Mr. Grant and Mr. Holmes both testify that the three relevant partners here, Meng Wang and Benwood, through Helms, were in the business of dealing in real estate? Well, it's important, Your Honor, Quinn Meng and Zhen Wang were not contributing partners. They were members of the entity that contributed. And the tax court improperly disaggregates that entity into its individual members. Doesn't it have to? Isn't that the nature of—the entity itself is made up of the partners. It's a pass-through entity. It is a pass-through entity, Your Honor, but the person that should have spoken on behalf of Mill Road Partners 125 would have been the managing member. I believe that's Quinn Meng. So the party of another individual who was not a partner— There's no requirement of evidence that someone can't testify to what these folks are in the business of doing if they're not the managing member. There's no rule that says that. The question is, is there competent evidence in the record—that's really the only question— that these folks were in the ordinary course of business of dealing in real estate? And it seems to me that both—they were asked directly, both Mr. Grant and Mr. Holmes— I can cite chapter and verse for you if you'd like—were asked that very question and said, yes, they were. Right, Your Honor, and simply being in the ordinary course of buying and selling property is not enough. I agree. There are other factors. There are other factors. There are the Winthrop factors, Your Honor. All right, so let's get to—well, let's start with the realty factors first. Yes, sir. Because there's a separate issue—I'm talking about this suburban realty— because there's a separate issue with regard to the Winthrop factors. So we've already established that there's at least some evidence that the taxpayers were engaged in the business of dealing in property. The question is then whether they were holding this property primarily for purpose for sale in that business. Isn't the answer to that yes? They were clearly bought it in order to be able to sell it as a flip, right? No, Your Honor. There was no—first, there was no sale. It was donated. And second, Mr. Holmes directly testified to that, that he didn't have a sale in mind. The judge asked him directly, what was your intent when you acquired this property? And he told the Court his intent was he didn't have a sale in mind, his words. So to the extent that this is similar to the Glade Creek case, as government suggests in its notice of supplemental authority, we would say we were on the other end of the spectrum, that the intent there had always been to sell. It was subdivided. It was platted. Wasn't Mr. Grant's testimony that the purpose of buying the original tract, the 117-acre tract, was specifically to sell it for a conservation easement transaction? That's a docket entry 123 at pages 814 to 816. Mr. Grant is not a partner, Your Honor. But, again, there's no—I mean, tell me if I'm wrong on this. But I don't know of a rule that says only the partner can give competent testimony to something that he has direct knowledge of. Well, that's intent, Your Honor. And I don't believe Mr. Grant can testify as to the intent of another entity, particularly an entity in which he does not have an ownership interest or property that he does not have ownership. He acted as the agent for this entity. And there's plenty of findings that the relationship between these folks is he helped sort of put all these things together. He worked with these folks for years. They were all friends. One was the wife of his former doctor who had passed away. And then the other one was the brother-in-law of one of the investors that were—the individual who was in China was the brother-in-law of the one who was here, but they were related. These are not vast entities here. This is a close-knit group. Mr. Grant served as managing member for many of the entities that were created over the course of the 11 transactions that these folks were involved in. How is he not able to give competent testimony about what the purpose of this transaction was? The rule, Your Honors, is the intent of the contributing partners. And Mr. Grant can give competent testimony, and he's certainly involved. But him simply being an agent of the contributing partners does not put them in a trade or business. I don't disagree with that, and we've already gone past the are you in a trade or business part. He testified, though, that the purpose of this group buying the property, the partners buying the property, was to sell it for a conservation easement transaction. And if that was the case, Your Honor, then the government— I cited to you—am I wrong in the transcript? He did testify to that. He testified to that. I absolutely agree, Your Honor, but there were no actual sales. Keep in mind that the transcript will also show you that Mr. Grant has never gone to college and does not have— But, counsel, we just established that the test was—and the factor that has to be found under the sum of a realty is whether the taxpayer was holding it for the property primarily for sale. And there's competent testimony to suggest that. And there's competent testimony by Mr. Helms, an actual contributing partner, to the contrary. I agree. And so what happens in that case is—but, counsel, what happens in that case is you have person one testifying to X, person two testifying to Y. A judge hears all that and then makes a call as to what the judge believes to be more credible. But that's not a clearly erroneous finding if it's based on some evidence in the record, is it not? I believe it's a legal error, Your Honor, because I think the law here is that you have an objective standard and a subjective standard. As to the subjective standard, you have contrary testimony, as you may have pointed out, but there are still the objective factors of Winthrop. And in the footnote where the tax court discusses Winthrop, it, again, disaggregates the partnership, incorrect as a matter of tax law. It also adds Mr. Grant in as a partner when he is not and fails to recognize that under that objective standard in this circuit, the least number of sales prior to a transaction being treated as a capital asset is 60. How do you— I have zero. You keep mentioning Winthrop. How do you get around the Borey case? Because Borey addressed almost an identical argument as you're making here. The facts of Borey are substantially different. They held that property. There were 60 sales transactions. I understand the facts are different, but the argument that you're talking about, that tax court did not properly consider the Winthrop factors, here's what we said, that the Winthrop factors, however, are not cited for any authority requiring the court to address each and every factor. In fact, Winthrop itself states, despite their frequent use, these seven factors in and of themselves have no independent significance but only form a part of the situation which in an individual case must be considered its entirety. We don't think these factors are meant to be mechanically applied so as to disallow a court from viewing the evidence in totality and drawing inferences. In Borey, the taxpayers held the property in deducted expenses as ordinary expenses in the course of business before they changed their mind and decided to treat it as a capital asset. But the point is the tax court didn't err because it didn't mechanically go through the factors. That's not an error. But the facts are relevant just as they were in Glade Creek as to the intent of the taxpayer. And here the intent of the taxpayer, the actual contributing partner, is different. So in Borey, they changed their mind at the last minute. They had held it out of this business and they did not. May I address the three errors the tax court made on value? You've got 21 seconds. Yes, Your Honor. The tax court did not apply the correct highest and best use test whether it was reasonably probable in the reasonably near future as required by the Treasury regulation, the Supreme Court in Olson, Palmer Ranch, and TOT property. The time of the donation, there was a robust market as identified by Mr. Points in which the tax court disregarded in its entirety. Thank you, Your Honor. I see my time has expired. Thank you. Ms. Rubin.  Good morning. My name is Jennifer Rubin and I represent the commissioner in this matter. I would like to start where my colleague on the other side started with the inventory question. And an awful lot of his argument seems to really turn on his claim that Benjamin Helms said that he did not have an intent to sell the property when he bought it. Wasn't there a memorandum trying to solicit buyers? I think it was maybe MR-36 investments. That was to try to purchase the syndicated conservation easement. So let's also start with another fact. There was a sale here. Daniel Carbonara bought 97% of this partnership in order to get control of the land. Everyone agrees that that was equivalent to purchasing the land. So there was, in fact, a sale as contemplated by Grant as he testified to. But let's talk about Benjamin Helms and the testimony that is being relied upon by my opponent, which comes at the tail end of a colloquy with the judge. And if you go to the page before that, so this is going to be document 121 at 123 to 24, the judge is trying to tease out, why did you purchase into this? He says, I'm obviously not saying this right, but can you help me out here? What did you hope to do, you? How did you hope to profit from this transaction here? Witness, well, when they divvied up the profits, then I would get some from the other LLC in Benwood. Court, when you ultimately sold. Witness, that's correct. Court, the property, basically. Witness, that's correct. Then you get to the lines that my opponent is citing. And did you have a sale in mind at the time that this quick claim deed was executed on December 30, 2014? Witness, no, I didn't have a sale in mind. Is Grant not competent to testify, as your opposing counsel has suggested, to a contrary fact? So let's assume I treat Helms' testimony as saying that the intent was not to sell the property at the time. But Grant, he concedes, has testified to the opposite of that. Is that not competent testimony that the tax court could have considered? It is entirely competent testimony, and the tax court explicitly relied upon it. And as your Honor pointed out, there is absolutely no support for the claim that you have to have one of the partners testifying to the intent. As long as you have someone with knowledge, and everyone agrees that Grant was all over this transaction. He had intimate knowledge. He was working with all the players. I would also say, though, that I would not agree with the assumption that that was what Helms was saying there. He bought it intending to sell it. He just didn't have a particular sale in mind on that date. And this is consistent with his other testimony on pages 114 to 17, 124 to 127, about how Helms and Benwards were in the real estate business buying and selling land together. And that on 117 to 118, and this is where Meng and Wang were in the real estate business with him. And so if you look at it all together, this piece of evidence that they're sort of waving around to say that this conflicts somehow with what Grant said doesn't really conflict at all. I will say to this, Counsel, you know, you have a very detailed order here, as you do from the tax court. You see many more of these than we do. But the tax court is generally very thorough on this stuff. This issue, which is sort of new, and not one that I have a lot of familiarity with, and again, we have two of three, this is the third of these cases this week for us. This is the only one where inventory has come up. It's the only one other than the Glade Creek case where inventory has come up that I could tell, even though it probably could apply in some other cases, it seems like. The analysis here is pretty skimpy. What do we do with that? I agree it is not as fulsome as everything, say, on valuation, talking about the comparable sales, which is a very strong part of the opinion. But we think there's enough there under Boree and under Glade Creek. You know, he said, look, we have this testimony that they were in the real estate business, that they held this as part of the real estate business, and that they contemplated selling it. That should be enough. And there's really no basis in the law to say that he actually had to do more than that. And there is evidence supporting it. Even in Boree, what we said there is the tax court went through some factors and just didn't discuss others. And so the argument was, well, the tax court's got to go through all of them. And we said, no, of course not. You don't have to do that. But even there, there was a discussion of some of the factors. Here the court, in a footnote, just sort of puts the back of the hand to the Winthrop factors. Have we ever approved that, and why is that okay? I don't know that you've ever specifically approved it, but you've definitely said that the core question is that you should always keep the focus on the core question, is whether the property was held in the ordinary course of business. And that was stated in both Suburban Realty and Thompson. And that's the question he answered. He said, this testimony is enough to answer the core question, the question this court has identified as the core question. And we would say that that's enough. Of course, the inventory is only one of the questions. We would say, look, my opponent did not address the ---- Well, let me ask. He did raise, and we should talk about some of it, but the one he did mention specifically was this concept of highest and best use. And his view is the district court had errors in its highest and best use, and those errors infected the valuation decision, and so we should reverse. Even if we find the inventory right, there's still the larger problem on the overall valuation. And that matters for the penalty. Right, that definitely matters for the penalty. I start with two answers. The first answer is the court also said even if it agreed with the taxpayer regarding the highest and best use, it still found that the property was overvalued. So if we're doing opinion writing, should we just ignore these arguments on highest and best use or just find any error would be harmless because the tax court made an alternative determination that even if I accepted your highest and best use, the valuation would be X? You definitely could write that opinion. That's the easiest way to write this opinion because here the comparable sales and sales history analysis is very strong and very much supported by the record. You have a whole bunch of different properties that these same folks are going around saying were equally eligible to be used for assisted living facilities in Henry County, and those are the comparables that the expert used. You have a strong sales history, very recent, of the same property being sold, being bought by Millrose Partners, being bought by Benwood, but most importantly being bought by Dan Carbonara's group. They do say, though, that there is some fundamental factual errors that sort of bear on some of these things. One is Grant's role. It seems to be that at least in one part of the tax court opinion, Grant's role as a managing member of the LLC or the underlying partnership was misstated. And also it seems to be that there's an assumption that there was zoning approvals. I know it's a two-level zoning process, but that process one approved the other properties, the ten others, which didn't seem to be right. That didn't in fact happen. How do those factual errors, which I think you will agree that they exist, and I want to get your position on that also, infect the overall valuation determination? On the Grant role, I believe it only had to do with inventory. I believe that my opponent believes that there was— It's actually in the factual finding part of the opinion. It's argued by him more in the inventory side for why his testimony is not competent to consider. But what Grant says and what he did underlies a lot of this. He's the one that got the zoning approvals. And misstating his role plus misstating what the first-level zoning review board did does have some bearing. And I guess I want to know what bearing that should have for us. It has zero bearing on the comparable sales and sales history. Why is that? Because that had nothing to do with Grant. That had to do with the fact that you had these other properties that were allegedly just as usable. Well, that has a lot to do with Grant. I mean, counsel, we just got done in the inventory part telling me how essential Grant is and how his testimony is absolutely competent to testify to this because he's all in those transactions. I think that's exactly what he said.  Then that has to mean his testimony matters a lot for the other piece of this, too. It doesn't matter for the comparable sales because that has to do with what other pieces of property were sold for. Right, but those other pieces of property, a lot of the ones that— at least part of the district court's analysis or the tax court's analysis was that, hey, there are 10 other pieces of property in the Mill Road area that these guys are packaging as ALFs. Right. And that matters. And if that is not right, meaning these were not approved by the zoning board as ALFs and that was part of the assumption the tax court did in using that as valuation evidence, then doesn't that call at least that piece into question? I don't think it does because he was relying on Kinney's testimony there that these were comparables. And notably, the taxpayers never argued that, in fact, these properties could not have been used to build assisted living facilities on. They're arguing it right now in the tax court that they could be. And so there's really no doubt about that. The only thing they've said about why they couldn't have been comparables, and this was in their reply brief, was ultimately they also got conservation easement put on them. But at the time that you're looking at it, the relevant time frame, these properties were available and you can look at their comparable sales, and that doesn't require Grant's testimony as to what the price was. And again, there's really no dispute, certainly not from the taxpayer, that these were comparable to these properties, to the Mill Road property that's at issue here. Moreover, the sales history is, again, doesn't rely on Grant's testimony, whether he was an agent or whether he was an owner. It really just relies on what was they sold for. And we know that Dan Carbonara, just three months earlier, after the conditional use recommendation was issued by the zoning staff, says, I'm going to pay this for a million dollars, which is extremely consistent with the valuation that Kenny came up with. Again, this doesn't rely on Grant. We'd also say that to the extent there was, I'd say that there was a few stray things that my opponent has latched onto about his statements about Grant. Other places, he seemed to acknowledge that he viewed him as an agent. It doesn't really matter for any of this, because as an agent, he was competent to testify on the inventory point. And as an agent, he definitely took all of these steps that are relevant to the highest business, the highest and best use analysis. So if you look at the highest and best use analysis, you wouldn't sit there and say, well, if he wasn't an owner, those actions were irrelevant. They're just as relevant whether he was an agent or whether he was an owner. And turning to the highest and best use analysis, if I may very quickly, there were two different levels of legal permissions that were required. And they don't even try to show that a developer could have had comfort that they could have gotten the state licensing that was required. And why would a developer pay extra money for this if they didn't believe that they were going to be able to get a licensed facility? But it doesn't seem as complicated as the tax court and some of the experts led on. I mean, some of the evidence was that you needed to get a CON, and that appears to be wrong, correct? I don't know that it actually is wrong. In my reading of the law, it is correct, because an assisted living facility is a version of a personal care home, and personal care homes require a certificate of need. There was a Georgia Department of Community Health witness who suggested you could try to get her letter of determination. But they're talking about a really unusually large assisted living facility, and there's no basis to say— Aren't they, though? I understand that that was how it was platted, and that's what was the zoning approval, but the valuation was done for far smaller than the original platting, correct? Even the smaller valuation one was much larger than the typical assisted living facility in this area. But that wouldn't necessarily require the hospital and the other stuff for the one that they're proposing, is it? Not necessarily. Definitely our witness got evidence indicating that if you did the 677, you would need the full range. But if it's less than that, then that seems to bear on the legal permissibility issue that that tax court seemed to rely heavily on. In other words, if it didn't violate the ordinance because it didn't require the hospital and all the other stuff, and if the state process, in fact, just needs a letter of determination, not a CON, and these other properties didn't actually go through the zoning process so that it would have crowded out the need there, then it doesn't seem to be all that impermissible, right? I don't know why it would not have crowded out the thing, because this property would have been behind the other ones. So remember, what they were doing was they had this whole process going in place, take a property up and push that one, take another property up, push that one. And so what the tax court actually found here, the tax court did not find that if the zoning approval process had continued, that the board would not have approved this. He said, I think there's a good chance it would have. What he said was, I think once you withdrew it and there's all these other applications coming up ahead of you, that's where I think the doubt comes in. As to highest and best use, your posting counsel in brief also makes the argument that there's factors that have to be considered, including market demand, and that wasn't sufficiently done here in going through all the necessary factors. Well, the tax court did rely on Kenny's report that said there was not a market demand for such a large facility. 440 units? It wasn't about 440 units? It was between 300 and 400 units. I think that's right. It was definitely not as large as what they put in their tax return, but it was definitely much larger than any of the units, buildings that were currently being used in Henry County, or that the witnesses that Kenny talked to in doing his market demand said would even be a possibility. I think if you look at the Kenny report, and this is going to be especially document 34 to 57 to 58, which is the same, I think, as exhibit 402-R, he went through all of the things he went through, and they were like, no one was going to build a facility of 300 beds there. There just wasn't that need. I think that's enough to do the market demand. But again, you could rule on valuation just by looking at the comparative sales and sales history analysis, and especially that sale to Daniel Carbonara. If there are no further questions, we urge you to affirm. Thank you, Ms. Rubin. Mr. Asbury, you have four minutes. Thank you, Your Honor. I'd like to start with the questions about the number of units. The certificate of need was not necessary. Had the tax court properly regarded Mr. Clanton's report and the value put forward by the taxpayer, it never would have gone through this morass of medical need and that analysis. That's simply an error of fact. And had they properly regarded Mr. Clanton's value and his proposal, this would have been an ordinary assisted living center. As to demand, Mr. Kinney's report actually says that the market would have welcomed an assisted living facility at the time. His market analysis is three pages of his reports. The tax court ignored the expert Brian points that it qualified over objection, and his report in its entirety, which he accepted over objection, to have it limited in sections. What about the fact that by withdrawing the application, and now you're getting in line behind the others that are also seeking similar approval, so it might shift the analysis? Correct, Your Honor. Two points on that. First, that Mr. Gibbs' test, the county official said people do that all the time, particularly if they're looking for a buyer, because, as Mr. Kinney admits in his report, the government's appraisal expert, a sophisticated buyer would know that it is legally permissible. And second, the tax court clearly erred by, in its appendix, listing all those properties as having a staff recommendation. But, counsel, that shows a zoning limitation on the number of beds. That's the issue. I mean, the reason they asked him to withdraw is like, hey, we make it a legitimate one of these, not a fake one like you guys, and we want to make sure that we have enough beds that are part of the zoning. Correct. And Mr. Grant acknowledged that what he was doing was attempting to establish his burden of proving that there was the market demand, and that was consistent with Henry County, who had shortened its zoning process to allow this conditional waiver. They wanted beds. The reason there were no comps in Henry County, real actual comps that had been developed into assisted living, was because two years earlier the county recognized the need and needed beds and abbreviated its zoning requirements. This didn't need to go before the Board of Commissioners. The 50-50 shot that the government contends applies to this does not. That's a Board of Commissioners vote. In this case, Mill Road was different from 10 comps used by the tax court and Mr. Kinney because all those verification letters were was an identification that that property in its current state could potentially initiate the process to receive a staff recommendation. So if those properties were also sold or developed or being developed for ALF purposes and they had eligibility letters that were there, then if those went first, those would have crowded out any opportunity to develop here, right? If I may, Your Honor, they were nowhere near the same status. Rural agricultural property in Henry County at the time was eligible for a conditional waiver. Those verification letters said, yes, you have the same zoning. That's all it said. So anyone, whether they had that letter or not, would be similarly situated. Mill Road was unique. It was two weeks away from a vote in July of 2016 from the Zoning Advisory Board, the last level they needed from complete rezoning. That's why the tax court erred as a matter of disregarding the legal permissibility. Again, as the government's expert said, Mr. Kinney, a sophisticated buyer would know that they were on the edge of legal permissibility. Those other ten properties, regardless of what Mr. Grant may have done with them or whatever, his purposes were not comparable properties. Are you saying, though, that by withdrawing the application, we don't need to look at the other ten properties at all? The other ten properties would have no effect once the application is resubmitted? Because the staff recommendation, Mr. Gibbs testified the staff wouldn't change their recommendation, right? And he said it would be legally problematic for the Zoning Advisory Board to That's not Judge Branch's question. Judge Branch's question is, does that mean we don't look at the other properties for purposes of determining whether A, would have been crowded out, and B, valuation? No, you don't look at those properties, Your Honor. They are not comparables at all. I'm sorry. My time has expired. Thank you. Thank you both. We have your case under advisement.